Please call the next case. 1140564, Daniel DeVille v. Workers' Compensation Comm'n Good morning, your honors. If it pleases the court, counsel, my name is Stephen Salk, and I represent the plaintiff, Manny Badillo. I'd like to outline the case and explain to you and get right to the chase why an opposite result is clearly apparent here. The accident is July 12, 2011. Let's put this case in context. My client is a 63-year-old man who worked for this company basically his entire adult life. He worked there for 30 years as a slitter, rewinder, as a laborer. What did his job duties require? He was required on his own to lift up to 100 pounds without assistance and engage in standing, bending, and climbing. What does that tell us that he was able to do that faithfully for 30 years up to the date of the accident, July 12, 2011? His medical history, he had no prior work accidents, no prior back or shoulder conditions. He was fully functional for this employer for 30 years. July 12, 2011, he's at a workstation sitting in what all slitters sit in, a metal folding chair. A forklift, he doesn't cause the accident, a forklift strikes a metal table behind him, hits the chair. He goes flying five feet into the air. His right arm is outstretched. I don't think anybody in the employer is not disputing there was an accident. Well, in a way they are. And it gets into Dr. Weber's opinions because they make a big deal here, and it's in the brief about they're disputing the mechanism of accident, not whether the man fell on a concrete floor on his back, but whether the chair had a back or not. So I won't belabor that point because I agree it's a red herring. After the accident, the employer sent him to Concentra, an occupational health center. Significantly, he's never discharged by Concentra. He's treated for the same complaints that he was later treated at Markey Medicos, the Medicos pain in Dr. Erickson, his back and bilateral shoulder pain. At his last visit at Concentra, he was continued under restrictions, no lifting over 15 pounds. Dr. Cole specifically recommended more treatment, prescribed both naproxen and acetaminophen. Let's cut to the chase. I think we know all the facts. You've spent 15 minutes giving us the background. The fact is the commission relied on Weber. Weber said it was reasonable to claim it may have sustained a back contusion or strain, but that's it, that although he had subjective complaints, there were no significant findings on examination. So tell us where the commission went wrong and hang their hat on Weber. First of all, let me just outline, please, the diagnostic tests. You're going to burn up all your time just regurgitating facts we already know. The operative report showed a, even Dr. Weber said there's a herniated disc but said it's insignificant. The operative report in the case showed that the herniated disc, which she said was insignificant, was an entrapped nerve. And that was seen internally by Dr. Erickson, a board certified neurosurgeon, when he did the surgery. And he conducted an SSCP, a both potential test, which as soon as he did the release of the nerve, the results of the test returned to a more normal deviation. So you have two factors. One, the smoking gun, the operative report, which Dr. Weber never looked at, which is compelling evidence that the man sustained more than a contusion, but in fact had a significant herniated disc. And two, the interoperative findings, as soon as the trapped nerve was released, his baseline returned to a more normal deviation. So he had surgery in November 2011 for the trapped nerve, correct? For the entrapped nerve, that is correct, which immediately reduces radiculopathy. There's no way that this man could have been working, performing that labor, had that entrapped nerve existed before the accident. It seems one of the problems for you is establishing radicular symptoms closer to the time of accident to provide a clear causal connection to the entrapped nerve that was found during surgery. So how do you address that? I would address that by saying to you, I recognize the problem. But when you have a nerve injury, it's not like a broken bone. It doesn't develop necessarily, depending on how much compression there is in the nerve. Yes, certainly you could have immediate radiculopathy, but it's quite common to have radiculopathy develop over a period of the time of a month to two months to three months after the accident. You're saying this here, but did a doctor say this, or did a medical record suggest this, or did the commission say this, that there is that natural progression? The doctors, all of the treating doctors expressed an opinion on causal connection, and that's in the record. Did they say specifically that the development of the radiculopathy could develop, progress over a period of time? We didn't do depths in that case, and in this case it was not specifically addressed. Honestly, most of my cases are the reverse. A lot of times there are symptoms, for example, that somebody may have some compression in the hands or the legs or some numbness, but they don't complain of back or neck pain, and then two months later they have neck or back pain, and I'm arguing that the radicular symptoms were actually a sign of the neck or the back problem. This is kind of the reverse of that. I mean, the man sustained substantial trauma to his back when he fell, and he had immediate back pain. The nerve problems developed over a period of time, and the proof is, I mean, how can you lie? I mean, to me, yes, if you had a criminal case and you didn't look at the DNA evidence, one would wonder why would you stick your head in the sand and not look at that evidence. Here's a case where we have compelling evidence of an operative report which shows, in fact, that the herniation, and Dr. Weber did say that there was a small herniation, albeit it was a small herniation, but it impinged. The MRI said it was impinging on the fecal sac. The EMG was abnormal, and the surgical findings showed that the doctors were correct. What more could you want to prove a case? That surgical findings corroborated Erickson and Engel, not Weber, correct? That is correct, sir. And that's, in essence, why you're saying the decision on that issue was against a manifest way? That and looking at all the facts, not in a vacuum, but as I said, The way you just see hypotheticals, there's documented physical evidence in support of the injury. Yes, sir. Thank you, counsel. Counsel, you may respond. Good morning, your honors. Attorney Ivan Yavis on behalf of the employer. Good morning, counsel. Can you hone in on that last issue because we don't need to set the facts of the type of chair, and he was having a cup of coffee, it was a bright sunny day. Tell us why, in that instance, he says, This is not a case that we sometimes get or frequently get where it's one doctor simply giving his opinion. He's saying that there's objective medical evidence documenting the injury that Weber didn't catch. Where's the causation opinion for that, your honor? Where do they say that that's related to the work incident? It's one thing to have a herniated disc diagnosed on an MRI. It's another to say that that herniated disc is related to a work incident or not. What about a chain of events? Could he use that? Where's the evidence for that? There's no opinion that was provided. Our doctor went through the causation opinion analysis to explain why, by the mechanism of the accident as it occurred, why she didn't believe the herniated disc was related. But you don't need any medical evidence in any case at all, correct? The claimant can testify that he was in good health. He has an accident. He's in bad health. He doesn't need anything beyond that, does he? Sure, but can he prove his case then at the commission? The commission is a prior fact. We've agreed to that. And their duty is to weigh the evidence. And if there's evidence that they can latch on to that supports one side or the other, they have the authority to rule in that way. In this case, again, I think it's pretty simple. They latched on to two doctors' opinions. They looked at the facts of the accident as was presented at arbitration, and they found the opinions expressed by Dr. Warburg to be more credible than the treating physician. That's where this comes down to. But doesn't there have to be a basis? I mean, you know, somebody goes into a hospital and they can't find anything wrong with them. The doctor says he's fine. He comes back and he's got internal bleeding. Are you going to say in that basis in the real world the first doctor's opinion should be given deference when obviously the physical evidence totally impeaches him? That's what he's saying. And, again, the commission has a right to determine which way they're going. You know, who do they believe in? Who do they find more credible based on the totality of the circumstances? I want to give you a hypothetical. It's later in the morning. The doctor says, I consulted the alignment of the planets in deciding this. And the commission believes him. So, according to you, that's all it takes, even if the opinion is based on nonsense, right? No, that's not correct. That's not what I'm talking about. Well, you know, there are exceptions to that. Oh, sure, sure. Exactly. I mean, did the, you know, did the Adler Planetarium say that today? Right. You know, if they said it, well, yeah. What did Dr. Ringel say? I'm sorry, Your Honor? Did Dr. Ringel give a causation opinion? No. He didn't? Where does he talk about it? He says, since the mechanism of his work-related accident was consistent with his current complaints, the work-related accident was the direct cause of Clamp's current pain. That's what he said in quotes. But where's the herniated disc causation? He was claiming back injuries. That's herniated disc is in the back. We're arguing here that it wasn't a back injury. Yeah. We're not arguing that. The question becomes, is the, you know, the extent of the injury that occurred based on the accident, was it a lumbar strain or was it? Well, clearly it wasn't a lumbar strain because when they operated on him, they found that he had a pinched nerve. And she said that he had nothing but a strain. He had a herniation. We know he had a herniation. The doctor who operated on him said he had a herniation. The MRI said he had one. But was the herniation related to the work accident? That's the issue. Weber says no. Well, wait a minute. Hold on. Weber says no, but she doesn't know what he has. She doesn't even know what he has. She looked at the medical records. And she didn't find a pinched nerve. Correct. Well, then she doesn't know what he has because that's what he had. I mean, you can't. When you say she reviewed the medical record, that didn't include the operative report, correct? That's correct. That's correct, Your Honor. And at that moment in time, Dr. Weber has given the medical records that it's presented at that day of the examination. The gentleman goes in and gets examined. The fact that he has the operation later doesn't negate what she had found based on her own examination and based on the medical records she did review at that date of her examination. What is Dr. Weber's specialty? She's an orthopedist. Okay. Is she a surgeon? That I do not know. I can't recall. I mean, on the letterhead, it indicates sports medicine. In the Midwest Orthopedics letterhead, she's listed as sports medicine. I'm just curious if it came out in other places. Her questions were never questioned by opposing counsel. They did not ask the opposer. They could have taken her testimony and asked all these questions. They allowed her report to go in as is. The commission relied on that report. Okay. So maybe she's a spine surgeon, maybe she's not. We don't know. But we know that Erickson is. He's a board-certified spine surgeon. He's an associate professor of neurosurgery at the University of Chicago. And he very clearly takes to task Dr. Weber and her opinion in regards to the extent of the injury here, and specifically what he found during the surgery. And, Your Honor, ultimately, this is a situation that we find ourselves every day at the commission. We've got different opinions, different causation opinions. Doctors say one thing, doctors say another thing. Ultimately, it's in the hands of the commission to decide, after reviewing all the evidence, which opinion they're going to adopt. The issue presented before you is that was the commission, were they within their math this way to rely on the opinions of Dr. Weber and find that at most he had a lumbar condition? I would assume that they did. He was first examined by Dr. Weber on October the 17th, 2011. Is that correct? Correct. And what was the date of his, he had an August MRI, didn't he? Correct. And what did that MRI show? It showed a disc herniation at level L5S1. That's right. Clean spine, mildly extruded nucleus. And she said he only had a back strain. She can't read MRIs? She doesn't know how to read them all? Or she didn't read it? Well, she didn't. That wasn't her diagnosis as a result of the work accident. No, no, no. Let's slow down a second. What did she say he had when she examined him? No diagnosis with respect to the clean and cervical spine, normal range of motion, preexisting. My opinion, there was no significant active diagnosis in regards to his bilateral shoulder complaints. Diagnosed nonspecific lumbar pain. May have sustained a lumbar contusion. That's correct. What happened to his herniated disc? He didn't have one? Did he have one or didn't he? By MRI, he did. Okay. And she must not have thought that that was related to the work accident. No, no, no. She did not say that it seems reasonable he may have sustained a back contusion or a strain based on the mechanism. If, indeed, he fell backwards, he may have contused his left shoulder. No specific mechanism to connect right shoulder injury to mechanism described cervical complaints of injury, and he described no specific cervical complaints of injury. You know, if she would have said he has a herniation, but the herniation was not caused by the work injury for this reason, that reason, the other reason, you may have the opinion you think you have. In this particular case, it appears to me she misdiagnosed the man. And if she misdiagnosed the man, her causal opinion is useless. If she did not diagnose this man with a pinched nerve or a herniated disc, then of what value was her causation opinion? Well, it certainly was, again, if Dr. Weber thought it was significant, I can only speculate at this point because we did not take her deposition. I can only speculate that, in her opinion, the herniated disc was not significant or caused by the work accident, otherwise she would have put it in her report. Well, I've got her report here, and her report, it's not specific as to a diagnosis related to the work accident. It's just what are your current diagnoses. And as Justice Hoffman points out, she does not indicate the disc herniation that was evident on the MRI. Again, I come before you with a case that was affirmed by the commission. No, no, no, no, no. Here, let's get back to the question we're asking. She states the MRI revealed a tiny central protrusion with no central or nerve impingement noted. And so based on that, she says, and there's evidence of symptom magnification, and then it turns out this guy's got nerve involvement. He's got a trapped nerve. And it occurs to me that if she misdiagnosed the man, then the value of her opinion is based on what she relied on, and she was wrong. So if what underpins her opinion has no value, what value is her opinion at all? No current disability in regards to cervical spine or lumbar spine. No further treatment of his injury sustained as a result of the work accident. It reached MMI. Again, Your Honor, all I can say is that Dr. Weber reviewed the medical records. She expressed her opinions. There was no issue brought up at trial that she misdiagnosed anything. It was not brought up at trial. Again, that could have come in the form of a deposition. The commission's intent of relying on her and an opposite conclusion is not clearly apparent, right? Exactly. Okay. Okay, thank you, counsel. Again, thank you for your time this morning. Counsel, you may reply. Thank you. Unless there's any questions to be answered. Thank you. I don't believe there are. Thank you. Thank you, counsel, both. This matter will be taken under advisement. Written disposition shall issue. Madam Clerk, we call the last case of the morning. Yeah, I know. 14-09-31, Douglas Airlines v. Richard Jenkins. Counsel, you may proceed. Good morning, Your Honors. Counsel, my name is Francisco Porto. I represent the defendant appellant before you, Richard Jenkins. So he wins before the arbitrary of the commission and the circuit courts rule it out, right? That is correct, Your Honor. And we have heard several times this morning that the great deference is to be given to the commission. I would like to point out that, in my opinion, Judge Saffaro did not give great deference to the commission. Did he reevaluate the credibility of the witnesses? Is that what he did? Where did he go wrong? He did. Well, as I point out in my brief, at least on two specific – let me – I will point out two things. First, he relied on information that we just cannot find on record, things that were allegedly spoken by Mr. Jenkins. Like he said that the entire time that he was fooling the briefcase, he was doing so in a supinated position. There's nothing – I cannot find anywhere in the record where Mr. Jenkins testified to that effect. Jenkins testified that his right palm and forearm were facing upwards the entire time. So that's what I was referring to. There's another section that I'll come – he quotes, Judge Sepeda quotes, Jenkins contradicts himself when on cross-examination he testified that one could not remove a bag in a supinated position in the particular aircraft in which he was injured. And Judge Sepeda has that in quotation marks. Again, if he sends us in quotation marks, I cannot find it in Mr. Jenkins. In other words, the claimant, as we're looking at the record, demonstrated the physical maneuver he used in the flight bag, and the arbitrator noted that. You're saying that that's what he did. He demonstrated it, but he never used those terms to describe what he was doing. Correct. Mr. Jenkins says he was not familiar with the words supinated or pronated, that he never used those words when he described it to his doctors or to anybody. Yet the trial judge attributed those remarks to him, to the claimant. Judge Sepeda, yes. Well, he basically found them not credible. He found his doctor not credible, and he believed that – and for that reason, he reversed the commission. Although the arbitrator in the commission specifically found the claimant's testimony was credible and consistent. Correct. And the arbitrator gives an outline as to the reasons why she found his testimony credible, which was not just his testimony, was the fact that he had reported the accident immediately afterwards to his co-pilot. He had told his co-pilot, yes, I injured myself, or he told him, I just injured myself, pulling the briefcase from the cockpit. Now, this is a man, a co-pilot, who he only met at that time. There was no bias. As a matter of fact, the insurance company hired an investigator to go and speak with this individual, with Mr. Bonner. So they interviewed Mr. Bonner, who had only seen my client, Mr. Jenkins, that one time when they flew together once. And he remembers the event. A year later, he remembered. He couldn't really remember my client anymore, his face anymore, but he remembered the event. And he corroborated my client's version of what happened that day. So the arbitrator also relied on Dolores Jackson, who is an employee of Southwest Airlines with Human Resources, the administrative branch of Southwest Airlines. And she took the report from my client about the incident approximately a week later when he reported. Well, your argument should be pretty simple, though. Your argument would be that this case turns on an assessment of the credibility of the witnesses and the weight to be given to the testimony. And you seem to be saying that the trial court improperly usurped the commission's function, right? That is my argument. It is a simple case. And it just – it is a simple case. It turns on these terms of pronated and supinated, terms that my client was not familiar with. But – and to be fair to defense counsel, when my client saw Dr. Escurido on December 31st of 2009, the note from Dr. Escurido says that he pulls the bag with his arm in a pronated position. Now, again, my client says, I never used those words. I just demonstrated what happened. And I'm sure when he was demonstrating to the doctor how the injury took place, he was not thinking in words like pronated and supinated. But that word does appear. And then it is the opinion of both doctors, both Dr. Holkamp, who is the doctor who performs the surgery, and the IME doctor. It's their opinion that for the injury to take place, that specific injury to take place, the arm has to be in a supinated position, which is found facing up. Okay? So now what I would like you to focus on is when my client – so there's that statement to Dr. Escurido, written by Dr. Escurido, about the pronated. And it doesn't really go any further. But then my client, in February of 2010, so fast forward a month and a half, he gives a recorded statement to an investigator that he sent by the insurance company to interview him. And he gives a description of the accident. And that description, of course, has no terms of supinated or pronated. There's none of that stuff. But he gives a description that if you compare that description – that's before he hires an attorney, that's before he files a workers' compensation claim. He's just talking to somebody who he understands represents the insurance company, but he's just giving a description of the accident. So if you compare that description to the description he gives to Dr. Holmkamp in April, to the testimony that he gives to the arbitrator, that description is consistent. There's no discrepancy in that consistency. And he just basically says, it was a very tight space between my seat and the body of the plane. That's where the briefcase was. Well, even if it was, you might be going beyond what you need to argue. Even if there was an inconsistency, allegedly, in these descriptions, who decides the weight to be given to those inconsistencies? Well, obviously the commission. And the commission affirmed and adopted the arbitrator's decision, which obviously the arbitrator actually asked Mr. Jenkins to demonstrate what he did and how he did. And Mr. Jenkins, during the trial, stood up and demonstrated how he pulled the briefcase hundreds of times from that very tight space. And I cut out an excerpt of what he testified to during the trial in my brief. And so there's nothing about being pronated or supinated, but basically he pulls the bag. And when he pulled the bag and got caught in a bolt and jerked it, you know, he pulled it hard and he felt tingling. And he's elbowed immediately. It's a simple accident. What are we supposed to do with the observation of the arbitrator and counsel's statement that during the demonstration his wrist and forearm were facing upward when making the movement? What are we supposed to do with that? Your Honor, you're referring to? Right. So the arbitrator is actually saying that his palm is facing up, right, which is a supinated position, which is how the injury takes place. As both doctors agree that for the injury to take place, the arm has to be in a supinated position. So, Your Honors, I think that, you know, again, it's a simple case. I think that the arbitrator listened to all the witnesses, gave us a step-by-step account as to why she made that decision. She compared the credibility of both doctors and gave us an account of what both doctors testified at the deposition. And interestingly, during cross-examination, when I asked Dr. Miller as to how the injury could occur, he actually testified that the injury could not occur either way. Whether the arm was supinated or pronated, the injury could not have occurred, which in a way was contrary to what he had said before. But by then he was just referring to the fact that he had pulled the bag or the briefcase so many times and the injury had never occurred before, so the odds that the injury was going to occur that time were very slim, which it's a logical fallacy to say that just because something didn't happen before, it did not happen when he was pulling the briefcase. So that's all I have. Thank you, Counsel. Counsel, you may respond. May it please the Court, Counsel? My name is Clint Brennan. I'm here on behalf of Southwest Airlines, the appellee in this case. And as you pointed out, Your Honor, the Circuit Court obviously reversed the decision of the Commission. Now, my interpretation of this Circuit Court decision was that he was not substituting in as weighing the credibility of the petitioner. He was just trying, he made a finding based on whether there was any credible testimony of the petitioner to rely upon at trial. Why don't we stop there? Because you're in a difficult position because the Commission, you would have to admit, obviously found the claimant's testimony to be credible, consistent with the medical evidence, and it carried the day before the Commission. So in light of some of the comments and the criticisms and the findings of the trial court, how do you avoid the well-settled proposition that the trial court, reviewing the Commission's decision, usurps the Commission's function when it finds a witness not to be credible? Is that, can the Circuit Court do that under the law? The Circuit Court can reverse a decision if it finds that it's completely against the manifest weight of the evidence. Not if it's based on a finding of credibility. That's a well-settled no-no in the law of what is not. The trial court, we can't even substitute, you know, our judgment for the fact finders on matters of credibility. We're prohibited from doing that. How can the trial court do it? Well, you also have the issue of addressing the credibility of the doctor's evidence that was submitted at trial. Well, they can't do that either, can they? Well, I believe that you came in this particular case because what it appears to read in this Circuit Court decision is that he also found that the condition was not causally connected to a work accident as a result. So I believe that you can advance an argument that a finding of causal connection was against the manifest weight. What are we supposed to do? In his decision, he quotes and says that the claimant contradicted himself because on cross-examining he testified, quote, one could not remove a bag in a supine position in the particular aircraft on which it was injured, close quote. He never said that. It's not in his. In fact, he said exactly the opposite. He said exactly the opposite. He said, he testified that it was not possible to lift the flight bag directly out of the space with the wrist in the pronated position, is what he said. I mean, Superior just got this wrong. I mean, I don't know where he got this quote from. Do you know where it comes from? I read Kelsey's brief. I did not see it in the record, Your Honor. I mean, it I don't know where he got this stuff. But it appears as if the trial judge thinks that he gets to reweigh the evidence and determine credibility. He doesn't. I guess your best argument, Your Honor, is convincing us that he didn't, in essence, reweigh the evidence and the credibility. Because to be very blunt with you, it appears that that's exactly what he did. Well, I believe if you weigh all the evidence, the medical chronology and the testimony that was submitted at trial, I believe that you cannot make a finding that the commission's decision was not against the manifest way of the evidence. Well, if the commission's decision wasn't against the manifest way of the evidence, what was Superior doing? What was the trial judge doing? Your Honor, I believe I misspoke there. You went to say the opposite. I apologize. One should be able to argue both sides of a case, but you don't want to do that. Well, I believe that after you've considered the initial medical chronology in this case, the 1231 report from Dr. Izquierdo where he noted that the petitioner's arm was down pronated the entire time, a second report from Dr. Holtkamp where she related the condition based under those pretenses, a third report from Dr. Holtkamp from April 20th where she said, well, the arm was down pronated, but it's shifted into a supinated position. And then at trial, the petitioner testified that his arm was supinated the entire time. So if you consider all three of those avenues, the medical opinions that relate the right elbow condition to the work accident are based on something that the petitioner arguably never told them. So making a finding of causal connection in this case, I would argue that it is against the medical sort of evidence. Your Honor, you've got evidence there. Whether it's true or not, that was his testimony. You've got supinated evidence, correct? Correct. Okay. And that's the mechanism of injury, correct? It would need to be, according to both Drs. Holtkamp and Dr. Miller, it needs to be in a supinated position to have stress on that. That's just what I said. And so that evidence was before the commission. And why would it be against manifest way to the evidence to hold other than they did? I would submit that the first evidence of supination didn't occur until roughly four months after the work accident. Yeah, but that's credibility. That's nothing but credibility. So in sum, you're asking us to uphold the circuit board? Mm-hmm. That's correct, Your Honor.  Very good. Thank you. Thank you, counsel. Counsel, you may reply. Judge, Your Honors, very briefly, I think I know where Judge Zepeda got that sentence about the entire time. We are curious. Tell us.  He argues. He argues in his brief. And it's just as he argued before you right now that his arm was supinated the entire time. But I gave you his actual testimony in trial. There might have been some confusion. The trial just took the brief as a recitation. He just took his brief, his sentence. But that's not the testimony of Mr. Jenkins. And it's there in the record for you to read what he actually testified to. So take a look at that. Okay. Very good. Thank you, counsel, for your arguments in this matter. And they will be taken under advisement. Witness positions shall issue, and the court will stand in recess until 9 a.m. tomorrow morning.